This case for argument is 15-1200, Industrial Technology Research v. Pacific Biosciences. Thank you, Your Honor. May it please the Court. The count in this case requires that you locate modified bases in a circular molecule by comparing the sequences of the forward and the reverse strand and then looking for mismatches in those sequences. The Board here awarded PACBio priority based on an application that didn't even mention, didn't even disclose mismatches, let alone use them to locate modified bases. And PACBio doesn't defend the Board's reasoning on two of the three grounds of obviousness and the third ground of obviousness improperly used E-Tree's own disclosure in the 630 patent against it. Before getting to priority and obviousness, I feel I need to address claim construction first. There's been a question raised whether the Board adopted E-Tree's claim construction of the count. And at A-10, the Board construed the count. It wasn't just simply repeating the parties' positions. It construed the count to require, quote, comparing. One compares the sequences of the forward and reverse strands and determines that a modified base is present at positions  A-10. That's the construction we're pushing on appeal. The Board applied only that construction. It applied that construction to the layered reference at A-40. It applied that construction to the 551 application at A-53 and 54. And that's the correct construction. It's the correct construction because it makes no sense to ignore the mismatch that's recited in the determining by comparing step. In fact, PacBio's own expert, Dr. Zahn, admitted that not only is the mismatch rendered irrelevant under PacBio's construction, but the entire comparing step is irrelevant under PacBio's construction. And then finally, the count, because it comes from E-Tree's specification, needs to be construed. In light of that specification, there is a section in the 630 patent talking about how you determine the position of modified bases. That's the title of the section. Every time a mismatch is mentioned in that section, it's actually used to determine the modified base. Before your time, you've got a limited amount of time. Speaking only for myself, of course, I'd appreciate your turning to Claim 23 and Claim 27 and 28. Of course. Well, those are the rejections I talked about earlier that PacBio abandons the board's reasoning. And Claim 23 requires that you use known inserts. And then you compare, you check the results of your sample sequence based on how accurate your known sequence was. The board found that that was taught by the 375 patent in Laird. And nowhere in either reference is that discussed. And so PacBio takes a different tack on appeal. And it decides that the advance of using known sequences in the inserts is just not too modest of an advance over the prior art to be given patentability. Well, they cite a section, a disclosure in 375 patent, which they say supports that this was already known. It doesn't support confirming the sequence of your sample by looking at scores of the insert. It talks about scoring, but it only talks about scoring the sample sequence and then rejecting or accepting the sample sequence based on the score that you derive from the sample sequence. There is no disclosure of using the inserts. There are a lot of useful things that the 375 patent talks about the inserts being used for, but it doesn't talk about scoring the inserts and then comparing that and then using that score to accept or reject the samples. But we're not talking about anticipation here, we're talking about obviousness. We are talking about obviousness. And so there are two responses to PacBio's position. The first is this isn't the position they raised in front of the PTO, so it's waived. But even if this court were inclined to perform that factual determination here, the board didn't make that factual determination that the differences are significant. They found that they were actually disclosed in the prior arc. But if this panel were to do that kind of fact finding, there's simply no evidence in the record. Their expert did not provide any testimony on obviousness of claim 23, and so there's no evidence to support PacBio's attorney argument that claim 3 is just an insignificant difference. In fact, PacBio ignores the significant advantage that claim 23 provides in that you can confirm a sample sequence without having to do the kind of redundant consensus sequencing that the 375 patent provides. What about claims 27 and 28? Those claims require the use of a base-linked analog in order to discriminate between modified and unmodified bases. The board found that because Laird simply discriminates between modified and unmodified bases, that's met. But there's no disclosure in Laird of using a base-discriminating analog to do that. PacBio must recognize that because they push a different rejection in front of this board, and that is combining the 375 patent with the 614 patent. Again, there's no evidence showing why that combination would have been made. If we agree with you that claims would not have been obvious, do you also have to win on the issue of PacBio's entitlement to its earlier provisional date? I do, and I'd like to get to that if we're done talking about claims 27 and 28. The board first applied the wrong legal standard in granting priority. The test isn't whether the 551 application requires only looking for matches. The correct standard is not whether one skilled in the art might be able to reconstruct the count based on the disclosure of the 551 application. The 551 application necessarily needs to disclose an embodiment of the count. Now, all of PacBio's arguments, all of the board's reasoning, is based on the assumption that the 551 application teaches subjecting a circular molecule to bisulfite treatment and then comparing the forward and reverse strands. There's no disclosure in the 551 application of doing that. They point to paragraph 17. The board pointed to paragraph 17, and PacBio mostly points to paragraph 17. To be sure, there is reference to a circular molecule. There is reference to comparing the forward and reverse strands, and then at the bottom of the paragraph, in the context of a different method for determining uracil, the statistics based methods that are described in the 551 application, that's the only time bisulfite treatment is mentioned. Even though it's in the paragraph, the bisulfite treatment is not mentioned in the context of this circular molecule where you compare the forward and reverse strands. In fact, bisulfite treatment is mentioned only four times in the 551 application. At the bottom of paragraph 17, in the context of the statistics based method, in paragraph 21, in paragraph 28, and in paragraph 23, where the authors of the 551 application tell us that the methods of the 551 application do not use, do not require, or do not use the similarities of uracil to thymine. In the context of bisulfite treatment, the relevant similarity between uracil and thymine is its propensity to bind with adenine. In the count, if you're going to subject the count to bisulfite treatment and use that embodiment of the count, the only way the count works is if you rely on uracil's propensity to bind with adenine, which paragraph 23 explicitly disclaims. In the time I have left, I'd like to touch on the other obviousness rejection, which is the obviousness rejection of claims 1 to 26. 23 is a different issue. That is, the count needs you to find the position of a modified base by comparing the forward and reverse strands to each other. The board said Laird explicitly looks for mismatches as evidence of the modified base, but it doesn't. Figure 2 is where everybody focused all their attention. Figure 2 has this nice comparison of the molecule with the forward and reverse strands on top of each other, and certain pairs are highlighted. Laird determines where the modified bases are before figure 2 is created. Before he matches up the forward and reverse strands, he compares the bisulfite-treated strand, the top strand, to this top strand of the untreated reference strand. The untreated reference strands are shown in 2A and 2C. Then for the reverse strands, he compares the reverse strand of the bisulfite-treated molecule to the reverse strand of the untreated reference. PacBio makes a lot of the highlighting that's in figure 2. Can I ask you, this is very difficult for me to understand, so it would be at least helpful for me, you're talking now about the board's analysis, which is at 839 and 840, so maybe you could point not to what PacBio is saying, but what the board said that was wrong here and missing. I guess it's mainly, in 840 they say, we disagree with your argument, and their analysis follows. Can you point me to where they went astray in their analysis, because it's pretty detailed and compelling to me. It is distilled in this sentence, at 840, 16 to 18, Laird explicitly teaches looking for guanine-thymine mismatches as evidence of non-methylated cytosine in a forward or reverse strand locus, and there's no support for that. The only evidence about how the mismatched modified bases were located in Laird is from Dr. Levy, who, pointing to the description at A724, finds indications that the top strands are compared to the top strands, the reverse strands are compared to the reverse strands, but nowhere, in order to locate the position of the modified bases, are the top strands compared to the reverse strands. That layup is only done after the modified bases have been located in order to study whether the methylation pattern, because this is what Laird is concerned about, whether the methylation pattern carries from one generation of cell to the next after they're divided. The key to the count is how you locate those bases in the first instance, and Laird just uses the prior art method of doing that. I see I'm about to get into my rebuttal time. Why don't we hear from Mr. Reines and then we'll see who wants to rebuttal. Thank you. Good morning, and may it please the Court, Edward Reines for PAC-BIO. Sorry, could you start off, and this is not on one side or the other, but just, there's several issues floating around, and Judge Lurie touched on this in terms of if we find one thing, if the case is over, and how that works. As my good friend pointed out, there's two independent grounds. There's the priority issue of benefit, and then there's obviousness. If you resolve in our favor, that is PAC-BIO's favor, on priority, that ends the interference, and that's all you need to do. If you address obviousness and find their claims invalid, then that would resolve the obviousness question against them. So the judgment can be held on either ground. And there are alternatives. Yes, and that was acknowledged, and I think under questioning. And they acknowledge that we stated that priority is an independent barrier to relief, and they didn't object to that, and they acknowledged all claims correspond to the account at page seven of their brief. On the benefit question, which I think is the easier of the two, because it's just one question rather than more than one. The easiest way to think about this, on the benefit priority, the easiest way to think about it is this is an A19 to paragraph 17 disclosure of using what's called the circular sequencing platform for modified base detection. In the key sense, it says sequence reads from the sense or forward strand can be compared to sequence reads from the anti-sense or reverse strand. I'm sorry, I'm not, you're on A19? A918. Sorry, A918. This is the 551 application, and we're establishing that we disclosed modified nucleotide identification through mismatch. And it's really, it's actually a two or three step argument, so it's not that complex in a very complex sea of information. It says the sequence reads from the forward strand are compared to sequence reads from the reverse strand, which is exactly what the claim says. And it says to further validate the existence of one or more modified bases. This is modified base detection. The easiest way for me to think about that is if you go to paragraph 21, which is on A919, the next page, it provides a very small genus, a very small group of modified bases that fall within the scope of the invention. And it includes bisulfite converted bases as the second, and frankly methylated bases, which is the meth C as the first. So it tells you that the modified base that's being detected by the comparison of one to the other is bisulfate. The only other real fact you need to know is the admitted fact that A2236 and other places that bisulfite treatment in the prior is typically harnessed to detect 5-meth or 5-meth. So the purpose for bisulfite treatment is that this is the key to the whole thing that you need in the modified base point. The key to the bisulfite treatment is you have Cs and you have meth Cs. So C is the standard base and meth C is the special modified base that you want to learn about because it affects life and genetics and humans. And if you treat the DNA with bisulfate, the regular C becomes a U. And the meth C is not changed. So it stays a meth C. The result of that is that when you run your sequencing reaction, however you do it, you could do it a gazillion ways, but when you fill in the complement, the U is complemented by an A, which is a mismatch because the U is really a C, not an A, and for some reason U simulates a T. So what you do is you basically filter out the Cs by converting them to Us with bisulfate. You keep the C pluses so you know when you have a complement of a G, G, you've got your modified base. So you just look at the complementary strand that you create where you have Gs, you know you have your C meth. So that's the only reason in the record that they use bisulfate, no other reason for this modified base detection. They didn't invent this. They don't claim to have invented it. They're very candid about that. And that's the only reason you use it. And it says bisulfate modified nucleotides are what you use to identify the modified bases. I mean there's really not an argument that's very good on the other side in this situation. I'm always happy to address worthwhile arguments. He made the point that there's several references to bisulfate. It's defined as one of the modified bases. That's all you need to know. Now the debate about claim construction, let me just debunk that, is our position is that the mismatch enables detection of the modified base. But the position of ITRI is that the mismatch modified base, that the modified base has to be the mismatch. In the case of this bisulfite treatment, which is what everyone's using and what everyone really cares about in general, is that the meth C is not mismatched because it still matches the G. You're filtering out the U's. Mr. Reines, what did the board earn with respect to claims 27 and 28 with respect to the disclosure of layered, which didn't disclose the use of discriminating analog? Yeah, I think I can shed some light there. So the issue that ITRI made below was a motivation to combine. The use, so there's another way that modified bases are detected, forget bisulfite, and this is you just have a special discriminating nucleotide analog that identifies them. It's just got a big flag on it and it's just that serves that special function. That's prior art. That's disclosed in their own patent application. In the 630 patent application, they disclose that and they refer to the 614 patent. They just admit that that's prior art. It's not a debated item whatsoever. They admit it at 8357, paragraph 76. They admit it at column 24, line 4246. So the idea of using a discriminating analog to find your modified base is old as the hills. Like their other claims, what they're basically doing is they're saying the circular sequencing platform that we invented can be used with a couple of bells and whistles. One is identifying modified bases with bisulfite. They admit bisulfite's old. There's no reason you wouldn't combine the two. They admit that these discriminating nucleotide analogs are old, identified as prior. They attempt on that one to argue why that shouldn't be combined. Their argument is that the discriminating nucleotide analogs that they refer to in their patent are base labeled. The label is on the base of the nucleotide. Their argument is that in our, being PacBio's, version of a circular sequencing platform that the preferred embodiment is a system that doesn't work very well with a base label. So it's only a motivation argument. The fact that they didn't invent discriminating nucleotide analogs, and my friend here will not come up and tell you that they did. It's acknowledged prior art. It's the idea of using the two together. What this map misapprehends is that there are numerous other alternatives, such as Sanger sequencing and sequencing by synthesis, disclosed in our 375 patent. Disclosed at column 5, line 10 through 35. Yes, we describe a special kind of circular sequencing platform that may not work so great with base labeled nucleotide analogs. The other point is that there's no claim requirement, and maybe this cuts to it easier. There's no claim requirement that the discriminating nucleotide analog be base labeled. Am I missing something or is, I mean, accepting your analysis is persuasive, that none of this is in the board opinion? On which point? On the point you were making on claims 27-28. On 27-28? Yes. On 27-28. Does that refer to the reference you just talked about, I think? I couldn't find an analysis by the board in its opinion on those claims. I think the analysis that they adopted was, why wouldn't you want, what they focused on and why they identified Laird, I think this got a little lost in the, you know, maybe we could have done a better job on our end, is that you would want to use, you've got this new circular platform that's wonderful, that's our company, there are all kinds of things you'd want to do with it. Identifying METC, I think you're going to hear about that in the future, it's important. So they took an old way of putting that, they thought they actually invented the circular platform, right? The analysis of the board is dead on because it's not whether discriminating analogs are in the prior art, they're old as the hills in the patent itself is known. It's whether you would combine them with the circular platform, whether that would be obvious. What the board did state is that Laird and the 375 and the sophisticated skill of those in the art would want to use discriminating nucleotide analogs with this great new circular platform. And so the question is, well, why wouldn't you want to use something, it's just a sequencing platform, why wouldn't you want to use something people use with other sequencing platforms with this sequencing platform? You would, you know, you ask yourself the question. They have an answer, let's respect that. Their answer is, well, you don't like base labeled nucleotide analogs. The board's point was, you would be highly motivated to use a really good way of identifying modified bases on this circular platform. And the substantial evidence in the record to support it is that you're not limited to base labeled nucleotide analogs by the claim. So why is that a problem, first of all? And second of all, you don't have to use the particular sequencing preferred embodiment we have where it doesn't work. There's Sanger sequencing, which base labels have been used forever on those, of course, and sequencing by synthesis where base labels are common. So there's other cases that I've been up in the score talking about base labeling. So base labeling is not unusual, it's used routinely in sequencing. Why wouldn't you just use a different one than the preferred embodiment if you have this great new discriminating nucleotide analog? I think there's at least substantial evidence to support the board on this. Not to mention the strength of the benefit position, which I started with. So if there's other questions, I know it's complicated subject matter. No? OK. Well, thank you very much. I appreciate it. Thank you, Your Honor. Just a few brief points in rebuttal. Mr. Reines' two to three step argument analysis for why they're entitled to the priority, that's an obviousness analysis. What he did in his presentation was he took a disclosure from one part of the 551 application, took a disclosure from another part of the 551 application, and then put them together in a way that does not satisfy the written description requirement of this court's case law and its predecessor's case law, which requires some sort of blaze marks or something in the record that shows that the inventors had in their possession the count. Now he talked about two things in particular. One is the description of modified bases and that it includes bisulfite modified bases. It does, but there are 12 other categories of modified bases that are listed in that very same paragraph. And there's nothing in paragraph 17 that would say use that particular modified base in combination with the circular molecule. He also said something else that I thought was revealing. He used the phrase U, the uracil, simulates a T. And it does, but paragraph 23 tells you that's not their invention. Paragraph 23 says we do not use methods where a U simulates a T. Now turning to claims 27 and 28, the point is not whether the claims require base labeled nucleotides. The point is that the 614 patent, the Zahn patent, teaches base labeled nucleotides. And the 102A prior art Pacific Bioscience presentation at the Cold Springs Harbor meeting tells you that base linked nucleotides cause enzyme inhibition. Our expert looked at that and he didn't say it was limited just to the smart bell molecule, which is the preferred embodiment of the 375 patent. He said one skilled in the art would interpret that as a general problem and be led away from combining the Zahn patent with the 375 patent. Zahn was their expert. He didn't provide any evidence, any testimony rebutting Dr. Levy on that point. And my last point is there was a lot of discussion about Sanger sequencing. Sanger sequencing is not single molecule sequencing and the 630 patent expressly distinguishes the two at A92 column 15 lines 13 to 19. And the basic point is that both the board and PacBio relied on the smart bell embodiment in order to argue obviousness of all the claims. And you can find that at A259 to 60, which is PacBio's arguments, and A28 to 29 where the board relies on that specific embodiment in its obviousness analysis. Unless there are any other questions, I'll see you the rest of my time. Thank you. Thank you. We thank both parties and the case is submitted.